# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| DAVID A. MAIENZA, | Civil Action No.: 2:25-cv-402-DCN-MGB |
| Plaintiff, | |
| vs. | **COMPLAINT**<br>**Violation of the ADEA**<br>**(Failure to Hire)** |
| LEE DISTRIBUTORS, LLC and REYES BEVERAGE GROUP, d/b/a REYES HOLDINGS, LLC, | |
| Defendants. | **JURY TRIAL DEMANDED** |

The plaintiff, complaining of the acts of the defendants, alleges as follows:

1. That the plaintiff is a citizen and resident of the County of Charleston, State of South Carolina.

2. That upon information and belief, Lee Distributors, LLC is a South Carolina corporation that joined Reyes Beverage Group (a foreign corporation) in 2006. Both entities do business as Reyes Holdings, LLC ("defendants"). The defendants are wholesale beer distributors doing business and maintaining offices and agents in various counties in the State of South Carolina, including the County of Berkeley, State of South Carolina.

3. That this court has federal question jurisdiction of the above-styled action pursuant to 29 U.S.C. § 623, et seq. (the Age Discrimination in Employment Act or "ADEA") and 28 U.S.C. § 1331.

4. That venue for all causes of action stated herein lies in the District of South Carolina, Charleston Division, as defendants do business in said district, plaintiff resides in the district, and a substantial portion of the facts giving rise to plaintiff's claims occurred in the said district.

1

## CONDITIONS PRECEDENT

5. That plaintiff has exhausted all administrative remedies and conditions precedent, including timeliness, deferral and all other jurisdictional requirements necessary for the maintenance of the foregoing action, all of which are more fully described below.

6. That at all relevant times as defined by the ADEA, defendants employed twenty (20) or more employees as required by the ADEA. As such, the defendants are "employers" as defined by the ADEA and are otherwise subject to and covered by said Act.

7. That on or about March 2l, 2024, and as a result of defendants' discriminatory conduct, all of which is more fully described below, plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on age.

8. That on or about November 4, 2024 plaintiff received a Notice of Right to Sue from the EEOC regarding the Charge of Discrimination described in Paragraph 7 above.

9. That plaintiff has timely filed the foregoing action within ninety (90) days of the date on which he received the Notice of Right to Sue described above in Paragraph 8.

## FACTUAL ALLEGATIONS

10. That plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 9 hereinabove as fully as if set forth verbatim.

11. That plaintiff was born in 1977 and, thus, was over forty (40) years of age during the time of the discriminatory actions alleged herein.

12. That plaintiff has nearly 20 years of experience in the beer distribution business (from in or around 2000 to in or around 2019), having worked at Columbus Distributing in Ohio initially as a warehouse employee, then as a route sales delivery driver. Plaintiff performed the duties of both of the jobs he held at Columbus Distributing in an above-

satisfactory fashion and he otherwise maintained an excellent employment record there. To this point, while employed at Columbus Distributing plaintiff always received overall high scores on his annual performance reviews; plaintiff's supervisors there routinely praised his job performance and told plaintiff he did a good job; and, plaintiff was never formally disciplined by said company.

13. That as a route sales delivery driver at Columbus Distributing plaintiff obtained and maintained a CDL license.

14. That sometime in 2022 or 2023 plaintiff and his wife decided to move to the Charleston, South Carolina area. They scheduled their move for the late spring/early summer of 2023.

15. That in relation to plaintiff's decision to move to South Carolina, the plaintiff began to look for work in the Charleston, South Carolina area. In or around the April or May 2023 timeframe, plaintiff saw that defendants had posted job openings at their Summerville, South Carolina location for several different positions on their website, including, but not limited to, an opening for a Class A CDL delivery driver and a sales associate. The Class A CDL delivery driver posting stated that the initial salary for the job would be between $60,000 and $100,000. Having worked for the same kind of company for almost 20 years, having performed the same job, route sales delivery driver, with his employer in Columbus, Ohio for 10 years – a job which included sales duties and having his CDL license, plaintiff took an immediate interest in the positions. In fact, given plaintiff's experience level, plaintiff thought that employment at defendants would be a perfect fit for all parties and plaintiff believed he would be in the mid to high range on the starting salary spectrum for the Class A CDL delivery driver position at defendants.

16.     That as directed in the postings, in or around April or May of 2023 plaintiff called Diminee Wilson ("Wilson"), the Talent Acquisition Recruiter for defendant Reyes Beverage Group (the company who owns Lee Distributing) to inquire about the above job openings.  Wilson confirmed the jobs were still open and plaintiff summarized his work experience to her.  Impressed by plaintiff's qualifications and the fact that he had a CDL license, Wilson encouraged plaintiff to apply for the positions.  Immediately after the call (in or around April or May of 2023) plaintiff filled out online employment applications for the Class A route delivery driver position and the sales associate position and submitted them to defendants (thereby officially applying for those two (2) jobs).

17.     That on or about June 21, 2023 at 1:43 p.m. Wilson sent plaintiff an email thanking plaintiff for his interest in the Class A delivery driver job; advising plaintiff that the company would like to schedule a 15-minute telephone interview with him; and instructing plaintiff to schedule the interview by clicking the "schedule interview" button at the bottom of the email. Within approximately 10 minutes after plaintiff clicked the button to schedule the interview, Wilson sent plaintiff an email confirming that plaintiff's 15-minute telephone interview for the job was scheduled for the following day, June 22, 2023, from 2:00 p.m. to 2:15 p.m.

18.     That at some point on or about June 21 or 22, 2023, plaintiff again spoke to Wilson and asked her if defendants preferred his first interview to be by telephone or "in person" since plaintiff planned to be in South Carolina in the near future.  Wilson replied that defendants would prefer to conduct the first interview in person.  As such, the 15-minute interview scheduled for June 22, 2023 never took place.  Instead, on or about that same day Wilson sent an email to plaintiff advising that he had an "in person" interview for the CDL delivery driver position on Friday, June 30, 2023 at 10:30 a.m. at defendants' facility in Summerville, South

Carolina. The email further advised that during the interview plaintiff would be meeting with the Delivery Manager, Joel Toporek ("Toporek"), and three (3) delivery supervisors: Lynwood Locke ("Locke"), Jason Gass ("Gass"), and Joe Gannon ("Gannon"). Finally, the email gave plaintiff some logistical information such as where to park and how to get into the building and it provided plaintiff with instructions on how to prepare for the interview.

19. That plaintiff followed all of defendants' pre-interview instructions to a "T" and was otherwise ready and extremely prepared for the interview.

20. That on or about June 30, 2023 plaintiff attended his in-person interview for the CDL delivery driver job at defendants' facility in Summerville, South Carolina as scheduled. Plaintiff was interviewed by Toporek (the Delivery Manager) and by Locke (one of the Delivery Supervisors). This interview was the first time Toporek or Locke (or for that matter anyone employed with defendants) ever set eyes on plaintiff. At the interview Toporek did most of the talking. Plaintiff was friendly, professional and responsive to all questions asked by both men. Besides being fully prepared for the interview and performing well, plaintiff was also perfectly qualified for all aspects of the job. After all, he had performed the exact same job in Ohio for ten years.

21. That at some point during the interview both Toporek and Locke began to repeatedly ask plaintiff if he *really* wanted to do the CDL Driver job and they repeatedly asked plaintiff whether he would be able to perform the duties of the job. Even after plaintiff made it clear that he did want the job and that he could perform the duties of the job, both interviewers continued to ask plaintiff those same questions. Not only that, but both interviewers remarked that everyone in the interview was about the same age and that they (Toporek and Locke) would never want to go back out there and drive a truck again at their age. Otherwise, the interviewers advised plaintiff that, before he could be hired for the job, he would have to take and pass a

physical exam and a driving test – two events plaintiff was more than happy to do. At the end of the interview, the men all exchanged pleasantries and plaintiff walked out of the building and to his car.

22. That as plaintiff was walking to his car after the interview, plaintiff noticed that Locke was following him. When both men reached plaintiff's vehicle, surprisingly Locke again asked plaintiff if he was sure he really wanted to do "this thing" – referring to the CDL delivery driver job. Once again plaintiff replied that he was sure he wanted to perform the route delivery driver job. All in all, plaintiff estimates that his interviewers made the above remarks or asked the same question at least ten (10) times during his first interview.

23. That plaintiff felt good about his performance during the interview. He was experienced and, thus, confident in responding to the interviewers' questions and plaintiff felt his interviewers had picked up on this normally favorable circumstance. At the same time, plaintiff was confused and a bit troubled over the repeated questions and comments the interviewers asked and made to plaintiff during the interview about age and plaintiff's desire and his ability to perform the duties of the CDL delivery driver job. In fact, those repeated questions and comments, the tone and demeanor of the interviewers in asking and making them, coupled with the excessive number of times they were made, caused plaintiff to feel like he was being discouraged from pursuing the job.

24. That on this point, the interviewers persisted in asking plaintiff the same questions, even though they already had the answers to their questions and comments. Of course plaintiff wanted the job. It paid an annual salary of between $60,000 and $100,000; plaintiff had already performed the exact same job in Ohio for 10 years; plaintiff applied for the job quickly and with enthusiasm, volunteering to do a face-to-face first interview when it was not required, and plaintiff could otherwise physically perform the duties of the job – he was in good shape and

6

had passed the physical exam he was required to take by defendants. Unable to persuade the plaintiff from pursuing the CDL delivery driver job, the defendants continued the interview process with plaintiff by having plaintiff get a physical exam and take a driving test.

   25. That to this end, on or about July 7, 2023, plaintiff went to a nearby Urgent Care to take his physical exam for the company. As expected, plaintiff passed his physical exam with no issues. After the exam plaintiff was given a certificate by the physician evidencing that he passed the exam. Plaintiff was a bit surprised that he had to pay the $130 for the visit out of his own pocket, but in the end the issue was trivial.

   26. That after the exam plaintiff immediately sent a text message to Toporek advising him that he had passed the physical exam. Within several minutes Toporek replied to the text by telling plaintiff to send him a picture of the certificate plaintiff received from Urgent Care. Again, within minutes of receiving the text message plaintiff sent a picture of the certificate to Toporek. After receiving the photo of the certificate, Toporek sent another text message to plaintiff asking plaintiff when plaintiff could come back to take his driving test. In response, the driving test was scheduled for 11:00 a.m. on Tuesday, July 11, 2023.

   27. That on or about July 11, 2023 plaintiff traveled to defendants' facility in Summerville, South Carolina to take his driving test. However, approximately 45 minutes after arriving, Toporek called and advised plaintiff that defendants did not have anyone at the facility at the time to administer the driving test. After a brief discussion, the test was rescheduled for Thursday, July 13, 2023 at 11:00 a.m. (That would also end up being the date of plaintiff's second interview.)

   28. That as scheduled, on or about July 13, 2023 plaintiff arrived at defendants' facility a little before 11:00 a.m. to take his driving test. The test involved driving a company truck for about 20 to 30 minutes on the highway, while a Delivery Supervisor sat in the

7

passenger seat giving plaintiff instructions on what to do and observing plaintiff's driving skills. Throughout the test, the supervisor administering it repeatedly praised plaintiff's driving skills, telling plaintiff that he was doing an "excellent job." Also during the test the accompanying supervisor went over the company's camera system with plaintiff – as if plaintiff was about to be hired. Ultimately plaintiff drove the truck back to defendants' facility at which time the accompanying supervisor told plaintiff that he did an excellent job on the driving test and that he had passed it.

29.    That at this point plaintiff had met all conditions imposed upon him to be hired into the CDL delivery driver job at defendants.

30.    That after the test was over plaintiff and the supervisor who administered the test walked into Toporek's office, where Toporek was seated at his desk. At that point Toporek asked the supervisor whether or not plaintiff could drive. The supervisor replied, with emphasis, "Oh yeah. He can drive." Toporek responded by saying "great" or by using words to that effect and told plaintiff that the Director of Operations would like to meet with him but that he was currently unavailable attending meetings and that they would have to wait for the Director of Operations to return from his meetings before they could speak to him. While waiting to speak to the Director of Operations, Toporek continued to question plaintiff about his desire and ability to perform the job. After waiting about an hour, the Director of Operations had Toporek and plaintiff walk to his office.

31.    That once in the Director's office, the Director talked to plaintiff about the beer business or industry in general terms. However, it was not long before the second interview turned into an odd repeat of the first one. On this point, the Director of Operations asked plaintiff if he *really* wanted to do the CDL delivery driver job and whether he really wanted to get back into "this." As before, plaintiff responded that he did want to be hired into the job and

that he did want to perform the duties that went along with it. The Director of Operations then asked plaintiff what year he graduated from high school (in a clear attempt to discover plaintiff's age). In the spirit of being transparent, plaintiff stated that he graduated from high school in 1996. In response, the Director of Operations remarked that he, too, had graduated from high school in 1996, further stating that "we are about the same age" and asking plaintiff yet again whether he was sure he wanted to do the CDL delivery driver job. Plaintiff replied that he did want to do it.

32. That during the conversation plaintiff told the Director of Operations that as a route delivery driver in Ohio he enjoyed "upselling" to the customers on his route. Misinterpreting the comment, later in the conversation the Director of Operations stated that it sounded to him like plaintiff was really interested in a sales associate position. Plaintiff explained that his primary experience was in the route delivery aspect of the business; that he was interested in all aspects of the beer distribution business including driving the trucks, making deliveries, and sales, among other things; but that at this point he would perform whatever job defendants would hire him into.

33. That in the end, the Director of Operations left to go to another meeting and Toporek told plaintiff that they were going to get him in, or that they were going to find a way to hire the plaintiff into a position at defendants.

34. That after this second interview plaintiff again felt he performed well. Plus, by then plaintiff had passed his physical, he had passed the driving test with flying colors, and he already had a CDL license – a fact plaintiff was told was important to defendants. Yet three (3) management employees at defendants, including the Director of Operations, had all repeatedly brought up the plaintiff's age at both interviews; they had asked plaintiff about his age; they tried to figure out plaintiff's age; they repeatedly questioned plaintiff's desire and

9

ability to perform the job; and they otherwise discouraged plaintiff from pursing the position due to the plaintiff's age.

35. That as of on or about July 17, 2023 (four days after plaintiff's last interview) plaintiff had not yet heard back from defendants about whether he had gotten the job. On that same day at 4:09 p.m. plaintiff sent a text message to Toporek, in effect asking if he had heard anything yet. Toporek did not respond to the text message. Two days later, on or about July 19, 2023, at 8:30 a.m. (six (6) days after plaintiff's last interview) plaintiff sent another text message to Toporek, again asking if he had heard anything yet about plaintiff's application for the delivery driver job. Again Toporek did not respond. That same day at 10:19 a.m. plaintiff sent an email to the recruiter, Wilson, advising her that no one from Human Resources at defendants had contacted him yet and asking her if she could reach out to someone about plaintiff's employment status with the defendants. Still that same day (July 19, 2023) at 12:35 p.m. Wilson sent plaintiff an email advising that plaintiff had an interview for the other job he had applied for at defendants – the sales associate job – on Thursday, July 20, 2023 at 11:00 a.m.; that the interview would be held virtually; and that the interview would be conducted by Liz Hamas ("Hamas"), the HR Manager. Plaintiff was very qualified for that job and met all the qualifications for it. Plaintiff likewise prepared for the interview. The fact that Hamas was going to interview plaintiff for the sales associate position concerned plaintiff as he understood that typically such interviews were conducted by the applicant's prospective supervisor, not a human resource employee.

36. That nevertheless, having not heard anything back yet from defendants about the delivery driver job, on or about July 20, 2023 plaintiff attended the interview for the sales associate position. The interview only lasted about 20 minutes and involved Hamas asking plaintiff generic questions such as whether plaintiff knew how to use the company system, to

which plaintiff responded "yes." As with plaintiff's other interviews, he was prepared for this interview and performed well at it. Plaintiff's wife, who heard the entire interview, confirmed to plaintiff that he did a good job during the interview. When it was over, Hamas told plaintiff that they would be back in touch. Still, the interview felt superficial and staged.

37. That four (4) days later (as of July 24, 2023) plaintiff had still not heard back from the company about the status of the two positions he had applied and interviewed for and, thus, on that day (July 24, 2023) plaintiff sent an email to Wilson "…inquiring about the sales position I interviewed for Thursday…."

38. That on or about July 25, 2023 at 5:19 p.m. Wilson emailed plaintiff advising he had not been selected to fill the open sales associate job. In response, plaintiff asked Wilson about the route delivery driver job. Wilson replied that he should have already received a letter about that job and then further advised plaintiff that he had been rejected from that job as well.

39. That also on or about July 25, 2023, at 5:51 p.m., the plaintiff sent an email to Toporek asking if the route driver position was still an option. At 5:54 p.m. that same day plaintiff sent a text message to Toporek stating that defendants had him interview for a sales job and asking Toporek, once again, whether the driving position was still available. Toporek did not respond to any of plaintiff's text messages. Defendants never did tell plaintiff why he was rejected from both positions.

40. That about a month later plaintiff found other work. However, the job plaintiff secured pays significantly less than what plaintiff would have made at defendants had he been hired into the route delivery driver position.

41. That under the circumstances, defendants refused and failed to hire the plaintiff because of his age.

11

## FOR A FIRST CAUSE OF ACTION:
## VIOLATION OF THE ADEA
## FAILURE TO HIRE BASED UPON AGE

42. That plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 41 hereinabove as fully as if set forth verbatim.

43. That at all relevant times as defined by the ADEA, defendants employed twenty (20) or more employees and thus, are an "employer" as defined by the ADEA and otherwise covered by that Act.

44. That at the time plaintiff applied for, was interviewed, and was rejected from both jobs, plaintiff was over forty (40) years of age and, therefore, he was (and is) a member of a protected class.

45. That in or around April and/or May of 2023, defendants were seeking to hire persons into its Class A CDL delivery driver and sales associates jobs. To this point, defendants posted or advertised that both positions were open and they otherwise invited interested persons to apply for the said jobs.

46. That as alleged above, plaintiff timely applied for both positions by calling defendants in relation to each job and by filling out and submitting job applications for each position to the defendants.

47. That moreover, plaintiff was interviewed by the defendants on two (2) separate occasions for the Class A CDL delivery driver job and on one (1) occasion for the sales associate job.

48. That plaintiff was especially qualified for both positions, as he had worked for a beer distributor (the same type of company as the defendants) in Ohio for almost twenty (20) years and spent ten (10) of those years working as a route delivery driver (the same type of job that defendants were hiring for) and a job that also required plaintiff to perform sales duties.

12

Moreover, plaintiff had obtained and maintained his CDL license, and otherwise had an exemplary work record at his prior job at the beer distributor in Ohio. In addition to all of the above, plaintiff performed well during all three (3) interviews he had with defendants, he passed his medical exam, and he passed his driving test that defendants also required him to take.

49. That despite the above, defendants rejected plaintiff from both positions without cause, reason, or explanation, and plaintiff was, therefore, subjected to an adverse employment action.

50. That upon information and belief, after rejecting plaintiff from the said jobs, defendants hired persons substantially younger than the plaintiff into both positions and/or they kept both positions open and continued to seek applicants for them. Moreover, despite being extremely qualified for the positions, several managers at defendants repeatedly made age-related remarks to plaintiff during the interview process, only after they saw him in person, and, thus, defendants rejected plaintiff from the jobs under circumstances which give rise to an inference of age discrimination.

51. That as such, defendants intentionally rejected the plaintiff from the jobs he applied for because of plaintiff's age and thereby violated the ADEA.

52. That as a direct result of defendants' discriminatory actions, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, expenses associated with moving, expenses related to paying for his own physical at defendants, other economic loss, his reasonable attorney's fees and costs, and prejudgment interest.

53. That moreover, defendants took the actions described above intentionally, knowingly, recklessly, and in utter disregard to plaintiff's federally protected rights and, therefore, plaintiff is entitled to recover liquidated damages from the defendants.

WHEREFORE, plaintiff prays for judgment against the defendants as follows:

(a) Plaintiff prays for such an amount of actual and special damages as the trier of fact may find (including lost back and future wages, income and benefits, medical bills, expenses associated with finding other work, expenses associated with moving, expenses related to paying for his own physical at defendants, and other economic injuries), liquidated damages, prejudgment interest, the costs and disbursements of this action, including plaintiff's reasonable attorney's fees, and for such other and further relief as the court deems reasonable, just and proper.

                HITCHCOCK & POTTS

                By: *s/A. Christopher Potts*
                Federal ID No.: 5517
                222 West Coleman Blvd., Suite 124 #11
                Mt. Pleasant, SC 29464
                Telephone: (843) 577-5000
                Email: cpotts@hitchcock-potts.com
                ***Attorneys for the Plaintiff***

Charleston, South Carolina
January 21, 2025